Harles H. WALLACE

v.

AMERICAN PETROFINA, INCORPORATED.

Civ. A. No. B–85–1123–CA.

United States District Court,
E.D. Texas,
Beaumont Division.

Aug. 19, 1987.

M. Diane Dwight, Provost, Umphrey, McPherson & Swearingen, Port Arthur, Tex., for plaintiff.

Donald E. Godwin, Maxwell, Godwin & Carlton, Dallas, Tex., for defendant.

## MEMORANDUM OPINION

COBB, District Judge.

Plaintiff, Harles H. Wallace, filed this action under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.*, alleging that the Retirement Committee of FINA, as the administrator of the Amdel, Inc., Non-contributory Retirement Plan (The Plan), failed to provide increased or additional benefits, and administered The Plan in an arbitrary and capricious manner. The court has recently denied the defendant's motion to dismiss, based upon improper venue, or in the alternative, to transfer this case to the United States District Court for the Northern District of Texas. The defendant now seeks summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and contends that the Retirement Committee correctly interpreted The Plan, and did not act in an arbitrary and capricious manner. For the reasons set forth herein, defendant's motion is hereby granted.

1. Paragraphs 12, 13, and 14 on page 7 of the Amdel plan provide as follows:

## I. FACTS

Wallace, a member of the Oil, Chemical and Atomic Workers International Union, Local No. 4–23, worked at Fina's Port Arthur Refinery for 32 years when he retired for health reasons on May 1, 1984. During his employment with Fina, a strike occurred at the Fina refinery, which lasted from January 7, 1982, through December 22, 1982. Wallace honored the picket line, and did not work at the Fina refinery during the strike. The effect of the 1982 strike on the calculation of pension benefits was discussed as part of the return to work agreement between Fina and the OCAW, which provided that the 1982 strike disqualified union members for the amount of "pension credit that they would otherwise have earned had they worked." Further, any benefits related to pension credit which might have accrued in 1982 were to be excluded or deducted from the years of credited service.

Upon Wallace's retirement, the Retirement Committee calculated Wallace's retirement benefits by determining whether Wallace was working on July 1, and had earnings "in effect." The pay rate in effect for July 1 of each year of Wallace's employment was verified through payroll records. To facilitate computations, Fina personnel in Dallas who computed benefits, assumed that Wallace was working full time based upon a 40–hour work week for 52 weeks, or 2080 hours per year.

On May 25, 1983, Sarah Bobo, a Fina employee, initially estimated Wallace's lump sum early retirement benefit by using the consecutive years 1981, 1982, and 1983, under the assumption that the pay rate "in effect" for 1982 was the same as 1981. After a review of the Amdel plan with other Fina employees, Sarah Bobo determined that the term "three consecutive years", as used in the definition of "final average earnings" (which refers to "normal basic earnings") required recalculation of Wallace's benefits to exclude 1982 because no basic earnings were "in effect" on July 1, 1982.[1] Therefore, it was necessary

12. Monthly earnings shall mean regular basic earnings for a regularly scheduled work week at straight time, exclusive of overtime,

to use the consecutive years 1979, 1980, and 1981, in the calculation to provide the highest aggregate of Wallace's "normal basic earnings."

On January 31, 1984, Sarah Bobo requested confirmation of the interpretation of the plan from Brendan O'Connor, a member of the Retirement Committee of the Amdel plan.[2] On March 7, 1984, the defendants obtained a legal opinion from outside counsel regarding an interpretation of the Amdel plan that excluded accrual of pension benefits during a period of strike following termination of a collective bargaining agreement. Legal counsel agreed that no earnings were "in effect" under the plain meaning of the terms of the plan, and concluded that the strike time could be excluded.

The final calculations of Wallace's retirement benefits excluded a twelve-month cumulative period for strike time, and a five-month period for suspension, which were periods of absence without pay. The years 1979, 1980, and 1981, were also used in calculating "final average earnings." On May 25, 1984, the actuarial firm of Towers, Perrin, Forster and Crosby issued its opinion agreeing with the defendant's calculations of Wallace's lump sum early retirement benefits, and stated that the calculations were consistent with the actuary's understanding and interpretation of the Amdel plan.

On June 14, 1984, Wallace accepted his lump sum retirement benefit, in the amount of $59,165.93 under protest that the years 1981, 1982, and 1983, should be used to calculate "final average earnings." In response to Wallace's protest, the retirement committee met and considered his

claims on September 21, and October 19, 1984. During this meeting, Mr. Willemstyn, a member of the committee, initially suggested using 1980, 1981, and 1983 for the purpose of calculating Wallace's benefits. The committee considered Mr. Willemstyn's suggestion, but decided that it did not meet provisions of The Plan. In making its interpretation, the Retirement Committee considered the terms of the Amdel plan, the return to work agreement, the advice of legal counsel, and the advice of the actuary firm. Since the Amdel plan did not make specific reference to strikes by employees, the retirement committee made an interpretation based upon the need for three consecutive years of earnings "in effect," and the break in service that occurred due to the strike. The Committee concluded that the absence of Mr. Wallace from work due to the 1982 strike was considered a break in service because it constituted a period of 12 consecutive months during which he did not complete more than 500 hours of service as defined by Article II, subparagraph 23 of the Amdel plan. Further, the committee construed the terms used in the definition of "final average earnings," and "normal basic earnings" by their plain meaning, and determined that the consecutive years 1979, 1980, and 1981, had to be used because there were no earnings "in effect" on July 1, 1982. The committee also considered the definition of "monthly earnings" in the Amdel plan that refers to earnings for a "regularly scheduled" work week, and determined that there was no regularly scheduled work week for the time excluded. Furthermore, the retirement committee determined that if the year 1982 were

---

shift differentials and other premium pay bonuses or other special compensation.

13. Normal basic earnings shall mean monthly earnings in effect on July 1 of each year converted to an annual rate of earnings.

14. Final average earnings shall mean for a period of continuance participation, one third of the aggregate of a participant's normal basic earnings for three consecutive years out of the last ten years of such period during which the aggregate of his normal basic earnings was the highest. For a period of participation less than three years, final average earnings shall mean the average of a participant's nor-

mal basic earnings during such period of participation.

2. The function of the Retirement Committee was to administer the Amdel plan and make interpretative decisions. The Amdel plan specifically provided for interpretation of its provisions by the Retirement Committee in § 4, Article 14, and, further, under Article 19, entitled "Claims Procedure," that the final decision of the Retirement Committee is conclusive and binding on all parties having, or claiming to have an interest in the claim being reviewed.

used in the calculation, then the highest average would not be yielded because Wallace had little or no earnings in 1982. Additionally, summary judgment evidence established that the consecutive years 1979, 1980, and 1981, had been used consistently in calculating benefits for other employees. Thus, the Retirement Committee denied Wallace's claims and appeals.

As a result, having extinguished his administrative remedies, Wallace filed suit claiming this calculation was erroneous. Wallace claims to be damaged in the sum of $10,274.72, which is the difference between the amount actually received by Wallace, and the amount he claims to be entitled to as a lump sum benefit or $69,-415.67. In calculating this amount, the years 1981, 1982, and 1983 were used in the formula, and it was assumed that the hourly rate of pay on July 1, 1982, was the same for July 1, 1981, and that Wallace was working and had earnings equal to that rate times 2080 hours.

Since the filing of the suit, Wallace has withdrawn his claim that there was an improper decrease in accrued benefits and his claim that there was a breach in fiduciary duty. However, Wallace continues to assert his claim that the Retirement Committee administered The Plan in an arbitrary and capricious manner. The defendant has filed a motion for summary judgment, contending that the evidence supports the opposite view, and requests the court to enter judgment accordingly. It is the opinion of the court that the defendant's motion for summary judgment should be granted.

## II. THE SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a party is entitled to summary judgment upon a demonstration "that there is no genuine issue of material fact to be tried in the case, and that the moving party is entitled to judgment as a matter of law." *DeAngelis v. Warner Lambert Co.*, 641 F.Supp. 467, 469 (S.D.N.Y.1986). The moving party bears the burden of showing the absence of any material issue of facts, and in reviewing a motion for summary judgment, the court must draw all reasonable inferences and resolve all ambiguities in favor of the non-movant. *DeAngelis*, 641 F.Supp. at 469. Irrelevant evidence is by definition immaterial, and the proffer of such evidence does not create an instance of material fact. *McKeithen v. S.S. Frosta*, 430 F.Supp. 899 (E.D.La. 1977). However, a party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which movant believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## III.

In a case in which an interpretation of a retirement plan, as applied to an individual, is challenged by the individual, the court must first determine the correct interpretation of the plan, and second, whether the plan's administrators acted arbitrarily or capriciously in light of the interpretation they gave the plan in the particular instance. *Denton v. First National Bank of Waco*, 765 F.2d 1295, 1304 (5th Cir.1985). *See also, Miles v. New York State Teamsters Conference Pension & Retirement Fund Employee Pension Benefit Plan*, 698 F.2d 593, 599 (2d Cir.1983), *cert. denied*, 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983); and *Dennard v. Richards Groups, Inc.*, 681 F.2d 306 (5th Cir. 1982).

## A. THE RETIREMENT COMMITTEE'S INTERPRETATION OF THE PLAN

Wallace claims in his second amended complaint that the Retirement Committee's interpretation of the Amdel Plan was in contradiction to its terms. *See Denton*, 765 F.2d at 1304. However, given the standard above, the court cannot say that the Retirement Committee's interpretation of The Plan was so erroneous so as to amount to arbitrary and capricious behavior. Article 13, § 5 of the Amdel plan provides that

The Plan is "governed by and construed in accordance with the laws of Texas." Under Texas law, the language used by parties in a contract should be accorded its plain and gramatical meaning unless it definitely appears that the intention of the parties would be defeated. *Lyons v. Montgomery*, 701 S.W.2d 641 (Tex.1985). Further, a strict interpretation and narrow reading of a contract does not permit the disregarding of the plain meaning of words. *Young v. Kilroy Oil Co. of Texas, Inc.*, 673 S.W.2d 236 (Tex.App.—Houston [1st] 1984, writ ref'd n.r.e.).

■ In interpreting the Amdel plan, the Retirement Committee determined that the term "three consecutive years", as used in the definition of "final average earnings", which of necessity refers to "normal basic earnings," required exclusion of the year 1982 from the calculation because no basic earnings were "in effect" on July 1, 1982. On the advice of legal counsel, the Retirement Committee correctly concluded that the term "in effect" should be accorded its plain meaning in that, under the circumstances, no basic earnings were "in effect." Furthermore, the Retirement Committee correctly concluded that it would be erroneous to use the years 1980, 1981, and 1983 in the calculation because the plain meaning of the term "consecutive" required the use of the years 1979, 1980, and 1981. In this respect, "consecutive" as defined in *Webster's New Universal Unabridged Dictionary*, p. 388 (2d Ed. 1983), and *Black's Law Dictionary*, p. 376 (4th Ed.1968), means "following in order; succeeding one another in a regular course; successive; uninterrupted in succession; and following in order or uninterrupted course, as a series of persons or things, either in time or in place." *See, Rose v. Rubenstein*, 693 S.W.2d 580 (Tex.App.—Houston [14th] 1985, writ dism.) (where the court relied upon the definition of the word "continuous" in the Webster's Third International Dictionary, Unabridged, pp. 493–494 (1967). Therefore, the court finds that, pursuant to the plain meaning of the terms used in the

Amdel plan, the Retirement Committee correctly interpreted The Plan under these terms.

Furthermore, the challenged interpretation of the Amdel plan was fair and reasonable in the context of the entire plan. *See, Denton*, 765 F.2d at 1304; *DeAngelis*, 641 F.Supp. at 470. The Retirement Committee considered that Wallace had a "one year break in service" as defined by The Plan in that the calendar year 1982 constituted a period of 12 consecutive months during which Wallace did not complete more than 500 hours of service. Wallace contends that, in this respect, an inconsistency exists because striking employees were accorded leave of absence status which is not deemed a break in "credited service" under Article 4, § 2 of the Amdel plan. Wallace bases this position on a letter dated January 16, 1982, written by W.R. Crabtree, Fina's employee relations manager, which provided "It has been the company's general policy and practice to classify employees who do not work because of a strike as being "on leave of absence without pay." However, the summary judgment evidence indicates that, although accorded leave of absence status, Wallace's leave of absence was not authorized, and therefore, Wallace's absence while on strike was properly considered a break in service by the Retirement Committee. Furthermore, the return to work agreement specifically provided that the 1982 strike disqualified Wallace, as an OCAW member, for the amount of "pension credit" he would have earned had he worked in 1982.[3] This view is consistent with the concept that a pension benefit is a form of deferred wage which must be earned.

Additionally, the retirement committee took into consideration the definition of "monthly earnings" in the Amdel plan, and determined that there was no "regularly scheduled" work week in 1982, because of the strike. As a result, the year 1982 was

---

3. In this respect, the Return to Work Agreement in all likelihood had the effect of superceding Fina's policy of "leave of absence without pay."

Wallace bargained away this policy in the Return to Work Agreement.

properly excluded from the computation of Wallace's pension benefits.

 Deference to a trustee's decision as to the interpretation of a pension plan is absolutely necessary to insure that the plan's fiduciaries retain the primary responsibility for the processing of claims. *Denton,* 765 F.2d at 1304. For this reason, the arbitrary and capricious standard was established to avoid excessive judicial interference with pension plan administration. *See, Miles,* 698 F.2d at 599. Where both the trustee of a pension fund and a rejected beneficiary offer rational, though conflicting interpretations of a plan, it is for the trustee, not the courts or the beneficiaries, to choose between two reasonable alternatives. *Edwards v. Wilkes-Barre Publishing Co. Pension Trust,* 757 F.2d 52, 57 (3d Cir.1985), *cert. denied,* 474 U.S. 843, 106 S.Ct. 130, 88 L.Ed.2d 107 (1985); *Miles,* 698 F.2d at 601. A trial court should not conduct a *de novo* evaluation of the retirement committee's actions as limited to reviewing those actions under the arbitrary and capricious standard. *Denton,* 765 F.2d at 1304. Given this standard and upon a review of the summary judgment evidence before the court, it cannot be said that the Retirement Committee's interpretation of The Plan was so incorrect as to amount to arbitrary and capricious conduct.

### B. ARBITRARY AND CAPRICIOUS CONDUCT IN LIGHT OF THE RETIREMENT COMMITTEE'S INTERPRETATION

It is also the opinion of the court that the Retirement Committee did not act arbitrarily or capriciously in light of its interpretation of the Amdel plan. The factual background of the retirement committee's determination does not demonstrate any inference of lack of good faith, or that procedural requirements were flagrantly violated in making the determination. *See, Denton,* 765 F.2d at 1304; *DeAngelis,* 641 F.2d at 471. In this respect, summary judgment evidence established that Fina relied in good faith on the advice of legal counsel and an actuary in supporting its interpretation. Furthermore, Fina provided an adequate opportunity for Wallace to protest its interpretation. Moreover, the Retirement Committee based its decision as to the interpretation of the plan upon all appropriate and relevant information, including the return to work agreement between Fina and the OCAW.

Summary judgment evidence also established that the Retirement Committee's interpretation of The Plan has been uniformly applied in similar situations. In this respect, the consecutive years 1979, 1980, and 1981, were used consistently in calculating benefits for other employees, and striking employees received no vacation pay in 1983 because they had not worked in 1982. Because of this consistent treatment of other employees, the summary judgment evidence refutes an inference of arbitrary and capricious conduct on the part of the Retirement Committee.

Wallace contends that other evidence of arbitrary and capricious conduct appears in this case to raise genuine issues of fact. Wallace first argues that an administrator's action in conflict with The Plan's provisions is the best evidence of arbitrary and capricious conduct. However, the court has already determined that the Retirement Committee's interpretation of The Plan was correct. Thus, this evidence is insufficient to refute the basis of the defendant's motion in the present case.

Next, Wallace contends that the computation of "normal basic earnings" under Wallace's Social Security offset was inconsistent with the computation of "normal basic earnings" under his pension formula. However, these two formulas require different computations, and the Retirement Committee construed the Social Security offset most favorably to Wallace. As such, the court finds this evidence insufficient to establish a genuine issue of material fact as to the arbitrary and capricious behavior on the part of the Retirement Committee.

Finally, the court finds that, although there is some evidence that no complaint ever made to the Retirement Committee has been adjusted in favor of the complaining employee, this evidence alone is insufficient to raise genuine issues of material

fact so as to deny defendant's motion for summary judgment.

## IV. CONCLUSION

Therefore, based upon the foregoing, the court is of the opinion that the defendant's motion for summary judgment should be and is hereby GRANTED as to plaintiff's cause of action based upon the alleged arbitrary and capricious conduct of the defendant. As a result, Wallace's cause of action is hereby DISMISSED.